UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KAMARA BOND,

      Plaintiff,                            Case No. 12-cv-15160
                                        Hon. Matthew F. Leitman

v.

SODECIA N.A., INC. and,
AEROTEK, INC.

      Defendants.

_____/

## OPINION AND ORDER GRANTING (1) DEFENDANT AEROTEK, INC.'S MOTION FOR SUMMARY JUDGMENT (ECF #32) AND (2) DEFENDANT SODECIA, N.A., INC'S MOTION FOR SUMMARY JUDGMENT (ECF #33)

## INTRODUCTION

In 2011, Defendant Aerotek, Inc. ("Aerotek"), a staffing agency, hired Plaintiff Kamara Bond ("Bond") and placed her with one if its clients, Defendant Sodecia N.A., Inc. ("Sodecia"). Bond asserts that after she began working at Sodecia, Sodecia employees discriminated against her based on her race. On December 6, 2011, Bond walked off the job and quit. She has now filed suit against Sodecia and Aerotek, claiming they constructively discharged her in violation of state and federal law anti-discrimination laws. Sodecia and Aerotek have each moved for summary judgment on Bond's claims. For the reasons explained below, the Court grants both motions.

1

## FACTUAL BACKGROUND

### A.      Aerotek's Relationship With Sodecia

Aerotek is a staffing company that hires temporary workers and places them with companies across the United States.  (*See* Statement of Material Facts Not in Dispute ("SOF"), ECF #33-1 at ¶1.)[1]  On January 17, 2011, Aerotek executed a "Services Agreement" with Sodecia, an automotive supplier, "under which Aerotek agreed to provide Contract Employees to Sodecia."  (SOF at ¶2; *See also* the "Services Agreement" ECF #33-3, Pg. ID 292-295.)   Pursuant to this agreement, Aerotek placed its employees at a Sodecia facility inside a General Motors ("General Motors") plant in Lake Orion, Michigan.

Aerotek remained the employer of the contract employees it placed with Sodecia.  Indeed, the Services Agreement expressly required Aerotek to provide "any salary or other benefits to [the] Contract Employees;" to make "all appropriate tax, social security, Medicare, and other withholding deductions and payments[;] and [to] provide worker's compensation insurance for its Contract Employees…" (Services Agreement at § 3, Pg. ID 292.)  While Aerotek employed the workers, Sodecia "control[led], manage[d] and supervise[d]" their work.  (SOF at ¶3, quoting the Services Agreement at § 2.2, Pg. ID 292.)

---

[1] Unless otherwise stated, Bond has admitted all references the Court has cited from Aerotek's "Statement of Material Facts Not in Dispute."  (*See* Bond's Br., ECF #36 at 6-9, Pg. ID 465-468.)

**B.      Aerotek Hires Bond and Places Her With Sodecia, and Bond Acknowledges That Aerotek is Her Employer**

In July 2011, Aerotek hired Bond and assigned her to work at Sodecia's Lake Orion facility. (SOF at ¶13.)  Bond worked for Sodecia as a "Quality Inspector." (*Id.* at ¶14.)  Bond "understood that…while she would be working for and at Sodecia, she would be employed by Aerotek." (*Id.* at ¶6.)

Before Bond began work, she "completed Aerotek's pre-employment paperwork, including (a) Aerotek's 'Policies and Procedures Statement'; and (b) an 'Employee Acknowledgment Form.'" (SOF at ¶8.)  Bond also received Aerotek's "Contract Employee Handbook." (*Id.* at ¶11.)  In the "Policies and Procedures Statement," Bond acknowledged that:

- "Upon becoming an Aerotek employee, all mandatory benefits … will be paid by Aerotek";

- "[She] underst[ood] that if [she] should have any unexcused incidents of tardiness or absence, Aerotek may elect to terminate [her] employment"; and

- "[She] underst[ood] that if terminated from an assignment, [she would] contact Aerotek immediately to make arrangements to receive [her] paycheck."

(*Id.* at ¶9; *See also* Policies and Procedures Statement, ECF #33-6, Pg. ID 348-349.)  Likewise, in the "Employment Acknowledgment Form," Bond confirmed that she had "entered into [an] employment relationship with Aerotek." (*Id.* at ¶10; *See also* Employment Acknowledgment Form, ECF #33-7, Pg. ID 350.)

3

## C.      The Initial Alleged Discrimination by Sodecia Employees

Bond says that she began to experience and/or witness incidents of racial discrimination by Sodecia employees in August 2011.  For example, Bond says that a Sodecia human resources employee named Diane "told [all of] the employees they were no longer allowed to wear [their] hats to the back."  (SOF at ¶24.)  According to Bond, Diane "was looking directly at a black male employee when she [explained the policy]."  (Bond Deposition, ECF #33-5 at 103, Pg. ID 103.)  Bond says that following Diane's pronouncement, black workers (including Bond) were not allowed to wear their hats facing backwards, but "Sodecia allowed two Caucasian employees to continue to wear their hats backwards." (SOF at ¶26; Bond Dep at 69, Pg. ID 311 and 103, Pg. ID 318.)[2]

Bond claims that Sodecia later barred workers from wearing jewelry on the job, but she says that Sodecia selectively enforced this policy in a discriminatory manner.  Specifically, she asserts that Sodecia forbade African Americans from wearing jewelry but "permitted three Caucasian employees to continue to wear jewelry."  (SOF at ¶26; *See also* Interrogatory Responses, ECF #33-12 at ¶7.)

Next, Bond says that when a "Floor Inspector" position became available, Sodecia passed her over and instead "promoted" a white employee, Janice Laidler

---

[2] Bond admitted, however, that she was unaware if Sodecia ever disciplined these white workers for violating the company's hat policy. (Bond Dep. at 105, Pg. ID 318.)

4

("Laidler").  (*See* Bond Dep. at 106-107, Pg. ID 319.)  Bond believed that Laidler was less qualified for the position because Laidler worked at Sodecia for less time than Bond. (*See id.* at 90-91, Pg. ID 315.)

Finally, Bond says that in October 2011, Sodecia Plant Manager Jeff Kalil ("Kalil") "gathered a group of [African American] employees together and told them (a) 'monkeys can do better than ya'll can'; and (b) 'if he could get real monkeys to do their job he would. But since they have a brain he was stuck with them.'"  (SOF at ¶29.)  Following that meeting, Bond reported her concerns about Kalil's comments to her Aerotek recruiter Ryan Stamper ("Stamper").  (*Id.* at ¶31.) Stamper relayed Bond's concerns to Sodecia, and Sodecia commenced an investigation.  (*Id.* at ¶32.)  Sodecia determined that Kalil's comments were not intentionally discriminatory but were nonetheless inappropriate.  Sodecia "counseled [Kalil] on appropriate conduct and acceptable and unacceptable types of references in discussion with employees and [instructed Kalil] that regardless of what was said or the intent behind his comments, perception is reality." (Investigation Summary, ECF #33-13.)

None of this alleged discrimination was severe enough to cause Bond to quit.  On the contrary, despite this alleged misconduct, Bond said that she "enjoyed working at Sodecia" and, right up until the day she walked off the job, Bond had no intention of leaving.  (Bond Dep. at 111, 114, Pg. ID 320, 321.)

5

**D.**    **Kalil Demands That Bond Apologize to a GM Forklift Driver; Bond Refuses and Walks off the Job**

According to Bond, in early December 2011, Kalil engaged in an act of discrimination that compelled her to quit.  Kalil's conduct was related to a dispute between Bond and a forklift driver in the Lake Orion plant.  The driver "was an employee of GM, not Aerotek or Sodecia."  (SOF at ¶43.)

In late 2011, Bond and the driver had an ongoing dispute about whether Bond was improperly walking through the driver's route – an area marked off by lines on the plant floor and known as the "orange crush zone." (SOF at ¶41.)  Bond says that during the dispute the "forklift driver threatened to run her over with his forklift."  (*Id.* at ¶43.)  Bond reported the alleged threats to a Sodecia employee named "Diane," and, after Diane spoke to a GM supervisor (Bond Dep. at 118-119, Pg. ID 322), the threats stopped. (*Id.* at 120, Pg. ID 322.)

Although the threats ceased, Bond contends that she and "the GM forklift driver continued to bicker about her walking through his work area."  (*Id.* at ¶47.)    Bond admitted that she likely cursed at the driver and "probably [told] him to shut the fuck up or something."  (*Id.* at ¶48.)  This "bickering" culminated with an incident on December 6, 2011, when Bond again walked through the forklift driver's route without authorization and had a final confrontation with the forklift driver.  (*Id.* at ¶49.)  The driver then told Kalil that Bond had been abusive towards him and had cursed at him.  "He [the driver] told

6

[Kalil] that … if Sodecia did not address Bond's attitude and her unsafe practice, he would file a formal complaint with [GM] and the UAW." (Kalil Aff. at ¶18.) Because GM had previously complained to Sodecia about its "employees [attempting] to cut through the orange crush zone in violation of the plant's safety rules, [] [Kalil] was concerned about this issue becoming a source of significant conflict between [Sodecia] and [its] customer [GM]." (*Id.* at ¶19.)

In order to try to defuse the situation, Kalil "approached [Bond], told [Bond] that she needed to respect Sodecia's suppliers (i.e. GM), and demanded that she apologize to the GM forklift driver." (SOF at ¶50.) Bond refused, "told [] Kalil that she would not apologize to the GM forklift driver … and then she left." (*Id.* at ¶51.) According to Bond, "[h]ad [she] not been disrespected on December 6th" and "[h]ad [Kalil] not approached [her] that day" and directed her to apologize, she would "still be working at [Sodecia]." (*Id.* at ¶¶56-57.)

## F.  Aerotek Searches for Additional Work for Bond After She Leaves Sodecia

After leaving Sodecia's facility, Bond called her Aerotek recruiter, Stamper, and told him that she had "just walked off the job that he sent [her] to" at Sodecia. (*Id.* at ¶52; *See also* Bond Dep. at 44-45, Pg. ID 306.) Stamper believed that Bond "did a really good job" at Sodecia, and he noted he would "use [Bond] again." (*Id.* at ¶53; *See also* Electronic Notes, ECF #33-11 at 2.) In the following months, Stamper and other Aerotek recruiters contacted Bond "several times" in an effort

to place her with other Aerotek clients.  (*See id.* at ¶63; Bond Dep at 34-37, Pg. ID 304; Electronic Notes at 1.)

**G.     Sodecia's Response to Bond's Claims of Discrimination**

Sodecia asserts that Bond has omitted some crucial details from her allegations of discrimination.  For example, Sodecia admits that it hired Laidler, not Bond, for the Floor Inspector position, but Sodecia has presented uncontroverted evidence that Laidler actually had twelve years' experience in parts inspection at other companies (Laidler Affidavit, ECF #32-9 at ¶2), and was therefore more qualified than Bond (or anyone else) for the position.  (Hooper Affidavit, ECF #32-8 at ¶2.)  In addition, Sodecia notes that the Floor Inspector position was not a "promotion," as Bond has called it, because it had the "same rate of pay, benefits and hours of work" as Bond's "Quality Inspector" position. (Laidler Affidavit, ECF #32-9 at ¶4.)

Sodecia also explains that while it did prohibit workers from wearing baseball caps backwards, from wearing hats with non-Sodecia logos, and from wearing "various kinds of jewelry around moving machinery," these policies were put in place to make Sodecia's workplace appear more professional and to ensure the safety of its workers. (Kalil Aff. at ¶¶12-14.)   Sodecia also says that these policies were applied "across the board" to all workers regardless of race.  (Kalil Aff. at ¶¶15.)

8

## PROCEDURAL HISTORY AND BOND'S CLAIMS IN THIS ACTION

Two days after she walked off the job at Sodecia, Bond filed a "Charge of Discrimination" with the EEOC.  (*Id.* at ¶64; *See also* the "Charge" at ECF #33-14.)  The Charge named only Sodecia; it did not name Aerotek.  (*Id.* at ¶65; *See also* the Charge, ECF #33-14.)  In the Charge, Bond said that she "believe[d] she was discriminated and retaliated against, subjected to different terms and conditions of discrimination, denied a promotion … and told that a monkey could do my job because of my race (African American) in violation of Title VII…"  (The Charge, ECF #33-14.)

After EEOC procedures failed to resolve Bond's dispute, the EEOC issued Bond a "right to sue" letter.  Bond thereafter filed suit in this Court against both Sodecia and Aerotek.  (*See* Compl. at ECF #1 and First. Am. Compl. at ECF #5.)  In her Amended Complaint, Bond outlines the various incidents of discrimination she claims to have suffered, including being passed over for the Floor Inspector position (First Am. Compl. at ¶10), the disparate treatment of employees related to the wearing of hats and jewelry (*id.* at ¶¶12-13), Kalil's "monkey" comments (*id.* at ¶14), and Kalil's demand that Bond apologize the GM forklift driver.  (*Id.* at ¶16.)  Bond concludes by alleging that she "was constructively discharged from her employment with Sodecia."  (*Id.* at ¶17.)

Bond brought her "constructive discharge" claims under both federal and state law.  In Count I of her Amended Complaint, Bond claims that the Defendants violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII").  (*Id.* at ¶¶19-26.)  Specifically, Bond alleges that "Defendants … were predisposed to discriminate on the basis of race and acted in accordance with that predisposition."  (*Id.* at ¶21.)  Bond also claims that "her employment was adversely affected when the Defendants allowed a pattern, practice and culture of racial discrimination to exist in the workplace."  (*Id.* at ¶22.)  These actions, Bond says, "caused [her] to become constructively discharged from her employment with Sodecia."  (*Id.* at ¶23(h).)  In Count II of the Amended Complaint, Bond makes the same allegations and claims that Defendants' actions violated Michigan's Elliot-Larsen Civil Rights Act, MCL § 37.2101 et seq. (the "ELCRA"). (*Id.* at ¶¶28-35.)

Following the close of discovery – during which Bond apparently did not take a single deposition – Sodecia and Aerotek each moved for summary judgment.  (*See* ECF #32, 33).  With their motions, Defendants also submitted "Statements of Material Fact Not in Dispute," and Bond admitted nearly all of facts identified by Defendants as undisputed.  (*See, e.g.,* Bond's Br., ECF #36 at 6-9, Pg. ID 465-468.)  The Court now grants both motions for summary judgment.

## GOVERNING LEGAL STANDARD

A movant is entitled to summary judgment when it "shows that there is no genuine dispute as to any material fact...." *U.S. SEC v. Sierra Brokerage Services, Inc.,* 712 F.3d 321, 326–27 (6th Cir. 2013) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, (1986)) (quotations omitted). When reviewing the record, "the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.* "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252. Moreover, "[i]n order to survive a motion for summary judgment, the non-moving party must be able to show 'sufficient probative evidence [that] would permit a finding in [their] favor on more than mere speculation, conjecture, or fantasy.'" *Arendale v. City of Memphis,* 519 F.3d 587, 605 (6th Cir. 2008) (citing and quoting *Lewis v. Philip Morris Inc.,* 355 F.3d 515, 533 (6th Cir. 2004)).

## ANALYSIS

### A.    Sodecia is Entitled to Summary Judgment

Sodecia has moved for summary judgment on Bond's Title VII and ELCRA claims. "Cases brought pursuant to the ELCRA are analyzed under the same evidentiary framework used in Title VII cases." *Humenny v. Genex Corp.*, 390

11

F.3d 901, 906 (6th Cir. 2004).  The Court will therefore analyze Bond's federal and state-law discrimination claims together.

### 1.   Title VII's Standards for Adverse Employment Actions and Constructive Discharge

Title VII prohibits employers from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e–2(a)(1).  "A plaintiff may establish a claim of discrimination [under Title VII] either by introducing direct evidence of discrimination or by presenting circumstantial evidence that would support an inference of discrimination." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014).  Bond does not dispute that her claim is largely premised on circumstantial evidence (*see* Bond's Br., ECF #35 at 13-15, Pg. ID 404-404), and that she therefore has the initial "burden of establishing a *prima facie* case [of discrimination]." *Laster*, 746 F.3d at 726-727 (internal citations omitted).  A plaintiff who cannot make this initial *prima facie* showing cannot escape summary judgment.

To establish a *prima facie* showing of discrimination under Title VII (and the ELCRA), Bond must demonstrate that "1) [s]he is a member of a protected class; 2) [s]he was qualified for the job and performed it satisfactorily; 3) despite [her] qualifications and performance, [s]he suffered an adverse employment action; and 4) [s]he was replaced by a person outside the protected class or was treated

12

less favorably than a similarly situated individual outside of his protected class." *Id.*

"In the context of a Title VII discrimination claim, an adverse employment action is defined as a materially adverse change in the terms or conditions of employment."   *Id.* (internal quotation marks omitted).   Such "[a]n adverse employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits … In addition, it typically inflicts direct economic harm."   *Id.* (internal quotations and quotation marks omitted).

A Title VII plaintiff may also "establish an adverse employment action by demonstrating that she was constructively discharged."   *Logan*, 259 F.3d at 568. "A constructive discharge occurs when the employer, rather than acting directly, deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation."   *Laster*, 746 F.3d at 727.   "To demonstrate a constructive discharge, Plaintiff must adduce evidence to show that 1) the employer ... deliberately create[d] intolerable working conditions, as perceived by a reasonable person, and 2) the employer did so with the intention of forcing the employee to quit...."   *Logan*, 259 F.3d at 568-569 (internal quotation marks omitted).

In order to determine "whether a reasonable person would have [felt] compelled to resign," a court should consider the following factors "singly or in combination: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status. *Laster*, 746 F.3d at 728.  "The test deliberately sets a high bar, as the law generally expects employees to remain on the job while pursing relief from harassment."  *McKelvey v. Sec. of the United States Army*, 450 Fed. App'x. 532, 535 (6th Cir. 2011).  In addition, when "determin[ing] if there is a constructive discharge, both the employer's intent and the employee's objective feelings must be examined."  *Logan*, 259 F.3d at 569.   "A plaintiff must show the employer intended and could reasonably foresee the impact of its conduct on the employee." *Ford v. General Motors Corp.*, 305 F.3d 545, 554 (6th Cir. 2012).

### 2.    Bond Has Failed to Establish a *Prima Facie* Case of Discrimination Under a Constructive Discharge Theory

Bond claims that Sodecia unlawfully discriminated against her when it "constructively discharged" her due to her race. (*See* Bond's Br., ECF #35 at 15-18, Pg. ID 406-409.)  Sodecia is entitled to summary judgment on this claim for two reasons.  First, Sodecia did not constructively discharge Bond.  Second, even if

14

Bond could establish a constructive discharge, she has failed to create a material factual dispute as to whether her race motivated the discharge.   Bond's constructive discharge theory of race discrimination therefore fails as a matter of law.

### a.    Sodecia Did Not Constructively Discharge Bond

As noted above, an employer constructively discharges an employee where the employer "deliberately create[s] intolerable working conditions, as perceived by a reasonable person" and does "so with the intention of forcing [the employee] to quit." *Laster*, 746 F.3d at 726-727.  Bond has not made the required *prima facie* showing on either element.

Bond asserts that her working conditions at Sodecia were "intolerable" because, among other things, Sodecia treated its African American and white workers differently with respect to the wearing of hats and jewelry and because Kalil used the racially-insensitive term "monkey."  (Bond's Br., ECF #35 at 16-17, Pg. ID 407-408.)  But to qualify under a constructive discharge theory, the conduct must be "sever[e]" and "humiliating," not a collection of "mere offensive utterance[s]." *Goldmeier v. Allstate Ins. Co.*, 337 F.3d 629, 635 (6th Cir. 2003). Bond has failed to satisfy that standard.  Indeed, as Bond herself has stressed, up until her very last day of work, she "enjoyed working at Sodecia" and "did not want to leave her employment."   (Bond's Br., ECF #35 at 7, Pg. ID 398.)  The fact

that Bond continued to work at Sodecia for months after the company's workers allegedly discriminated against her cuts strongly against a finding that the environment was so toxic that she felt compelled to "quit, rather than tolerate it for one more day." *Goldmeier*, 337 F.3d at 635.

Moreover, Bond has failed to establish that Sodecia undertook an intentional effort to get her to quit. In fact, the record shows just the opposite: when Bond raised concerns about her work environment with Sodecia, it acted to address her concerns and to improve her working environment. For example, when Bond complained to "Diane" about threats from the GM forklift driver, Sodecia raised the concerns with GM (Bond. Dep. at 118-119, Pg. ID 322), and the threats stopped. (*See id.* at  120, Pg. ID 322.) And when Bond raised concerns about Kalil's "monkey" comments, Sodecia commenced an investigation, and it counseled Kalil in an effort to prevent further issues. (SOF at ¶¶31-32; *See also* Investigation Summary, ECF #33-13.)

Bond tries to save her constructive discharge claim by arguing that her working conditions became intolerable on December 6, 2011, when Kalil demanded that she apologize to the GM forklift driver. But Bond has failed to show that Kalil's demand that Bond was improper. As Kalil explained in his undisputed affidavit, he insisted that Bond apologize because, based on prior communications from GM, he "was concerned about [the dispute between Bond

16

and the GM employee] becoming a source of significant conflict between [Sodecia] and [its] customer [GM]."  (Kalil Aff. at ¶19.)  Kalil's requirement that Bond apologize did not transform a working environment that Bond "enjoyed" into an objectively unbearable one.  Moreover, Bond failed to present evidence that Kalil acted with the intent to force Bond to quit.  Bond has not, for example, presented any facts to challenge Kalil's statements that he "did not expect [his demand she apologize] to become a major incident," and that he had "no idea that [Bond] would react in the way she did."  (*Id.* at ¶20.)  Bond simply has no evidence that Kalil or Sodecia acted with the necessary intent.  Bond therefore has failed to establish a *prima facie* case that Sodecia constructively discharged her.

### b. Even if Bond Could Establish a Constructive Discharge, She Has Not Established the Discharge Was Racially Motivated

Even if Bond's confrontation with Kalil amounted to a constructive discharge (and it did not), her discrimination claims would still fail because Bond has failed to present evidence that Kalil's demand that she apologize had anything to do with her race. *See, e.g., Trepka v. Board of Educ.*, 28 Fed. App'x 455, 462 (6th Cir. 2002) ("[C]onduct that forces an employee to quit, constituting 'constructive discharge,' is actionable only if the conduct is motivated by discriminatory intent against a protected employee characteristic.").  As described above, in Kalil's undisputed affidavit, he explained that he directed Bond to apologize in order to avoid a problem with GM.  Bond has not countered Kalil's

17

explanation with any evidence that Kalil's apology demand was driven in any way by racial animus.    For example, Bond has not presented any evidence that Kalil allowed white employees to curse at General Motors employees without consequence while forcing black employees, like Bond, to apologize for similar actions.    Because Bond has not presented any evidence that her alleged constructive discharge was tied to her race, Sodecia is entitled to summary judgment.

**3.    Bond Has Failed to Establish a *Prima Facie* Case of Discrimination Related to Sodecia's Decision Not to Hire Bond as Floor Inspector**

Bond also argues that Sodecia unlawfully discriminated against her when it "promoted" Laidler, rather than her, to the Floor Inspector position.  This claim fails as a matter of law for two independent reasons.

First, Bond has failed to show that the Floor Inspector position would have been a promotion for Bond such that Sodecia's decision to give the position to Laidler could be considered an adverse employment action.  As Laidler explained in her sworn affidavit, the "position of Floor Inspector was not a promotion from the position of Quality Inspector." (Laidler Affidavit, ECF #32-9 at ¶4.)  The two positions have the "same rate of pay, benefits and hours of work."  (*Id*.)  And the responsibility in both jobs is "to inspect the quality of the parts produced in the

work cells." (*Id*.)  The "only difference between the jobs" is that a Floor Inspector "could be directed to inspect parts from different work cells." (*Id*.)

In her brief opposing Sodecia's motion for summary judgment, Bond asserts that the Floor Inspector position "required more work, supervisory duties … and is a 'stepping stone' position that helps lead to higher paying positions" (Bond's Br., ECF #35 at 18, Pg. ID 409), but Bond cites absolutely no evidence in the record to that effect.  This Court is not required to search the record for evidence supporting Bond's naked assertion about the differences between the two positions, *see, e.g., Hollon ex rel. Hollon v. Comm'r of Soc. Sec*., 447 F.3d 477, 491 (6th Cir. 2006), and Bond's failure to cite evidence establishing any meaningful differences between the two positions dooms her claim that Sodecia subjected her to an adverse employment action when it did not assign her to the Floor Inspector position.

Second, even if Bond could show that she suffered an adverse employment action when Sodecia assigned Laidler, instead of Bond, to the Floor Inspector position, Bond's claim would still fail because she has not shown that she was "similarly-situated" to – i.e., that she had "similar qualifications" as – Laidler.  The undisputed facts unequivocally establish that Laidler had substantially more experience in parts inspection than Bond – twelve years prior experience for Laidler, zero years for Bond – and, thus, that Laidler was far more qualified than

19

Bond for any position involving parts inspection – including, of course, the Floor Inspector position.  So, even if the Floor Inspector position was a promotion, Laidler's superior qualifications are fatal to Bond's claim that Sodecia unlawfully discriminated against Bond when it assigned Laidler to that position. *See, e.g., White v. Columbus Metropolitan Housing Authority*, 429 F.3d 252, 242 (6th Cir. 2005) (affirming dismissal of Title VII claim and finding plaintiff failed to make *prima facie* case of discrimination when he was not as qualified as person who received a promotion).  As in *White*, "[c]omparing the qualifications of [Bond] and [Ladlier, who had twelve-years prior experience in parts inspection], it is clear that [Ladlier] has superior experience in material and relevant respects, and therefore, [Bond] and [Ladlier] cannot be considered similarly qualified for the position, as required to meet … [Bond's] *prima facie* burden." *Id.* at 244.

## B.    Aerotek is Entitled to Summary Judgment

Aerotek has also moved for summary judgment.  (*See* ECF #33.)  It does so on two grounds.  First, Aerotek argues that Bond's Title VII claim fails because Bond failed to name Aerotek in the Charge.  (*See id.* at 10-16, Pg. ID 255-261.)  Second, Aerotek argues that Bond's Title VII and state-law ELCRA claims fail because it did not take any adverse employment action against her and did not discriminate against her in any way.  (*See id.* at 16-25, Pg. ID 261-270.)  The Court agrees and for all of the reasons stated below, grants Aerotek summary judgment.

20

**1.      A Party Must Be Named in an EEOC Charge Before That Party Can Be Sued Under Title VII Unless an "Identity of Interest" Exists**

"[A]n administrative charge must be filed with the EEOC before a discrimination plaintiff can bring a Title VII action in federal district court." *Romain v. Kurek*, 836 F.2d 241, 245 (6th Cir. 1987). "A corollary of this general rule is that a party must be *named* in the EEOC charge before that party may be sued under Title VII….'" *Id.* (emphasis in original) (quoting *Jones v. Truck Drivers Local Union No. 299*, 748 F.2d 1083, 1086 (6th Cir. 1984)). Requiring a plaintiff to name the Title VII defendant in the charge filed with the EEOC advances two primary goals:

> First, the charge serves to notify the defendant of the discrimination claim alleged against him. By receiving notice of the claim, a defendant is able to preserve evidence that could be useful in his defense. Second, by naming the charged party and bringing him before the EEOC, that person is able to participate in conciliation efforts directed at securing voluntary compliance with the Act. Conciliation is a primary goal of Title VII and provides an avenue for compliance without the resort to the expense and inconvenience of litigation.

*Id.* (internal citations omitted).

21

"The failure to name a Title VII defendant as a respondent in the EEOC charge," however, "will be excused if an 'identity of interest' is found to exist between the named and unnamed parties." *Id.* "A clear identity of interest implies that the named and unnamed parties are virtual alter egos … [and not] two distinct entities with different business operations." *Knafel v. Pepsi-Cola Bottlers, Inc.*, 899 F.2d 1473, 1481 (6th Cir. 1990) (concluding that dismissal of three defendants not named in EEOC charge "was proper"). The "identity of interest" exception "acknowledges the reality that laymen, unassisted by trained lawyers, initiate the process of filing a charge with the EEOC, and accordingly prevents frustration of the remedial goals of Title VII by not requiring procedural exactness in stating the charge." *Id.*

The Sixth Circuit uses two tests for determining whether a party shares an "identity of interest" with another party that would excuse a failure to name the party on the EEOC charge. *See Romain*, 836 F.2d at 245. Under the first test, "an identity of interest" exists "where the unnamed party has been provided with adequate notice of the charge under circumstances which afford him an opportunity to participate in conciliation proceedings aimed at voluntary compliance." *Romain*, 836 F.2d at 245 (citing *Eggleston v. Chicago Journeymen Plumbers' Local Union No. 130,* 657 F.2d 890, 905 (7th Cir. 1981)). Under second test, a court "looks at the relationship between the named and unnamed

22

parties at the time the charge is filed and conciliation efforts occur." *Id.* at 245-46.

In looking at the relationship, a court examines four factors:

> (1) [W]hether the role of the unnamed party could through reasonable effort by the complainant be ascertained at the time of the filing of the EEOC complaint;
>
> (2) [W]hether, under the circumstances, the interests of a named [party] are so similar as the unnamed party's that for the purpose of obtaining voluntary conciliation and compliance it would be unnecessary to include the unnamed party in the EEOC proceedings;
>
> (3) [W]hether its absence from the EEOC proceedings resulted in actual prejudice to the interests of the unnamed party;
>
> (4) [W]hether the unnamed party has in some way represented to the complainant that its relationship with the complainant is to be through the named party.

*Id.* at 246 (quoting *Glus v. G.C. Murphy Co.,* 562 F.2d 880, 888 (3d Cir. 1977)).

Bond's failure to name Aerotek in the Charge requires dismissal of her claims

against Aerotek under both tests.

## 2.   Aerotek is Entitled to Summary Judgment on Bond's Title VII Claim Because Bond Did Not Name Aerotek in the Charge

Bond admits that she named only Sodecia, and not Aeortek, in the Charge.

(*See, e.g.,* Bond's Br., ECF #36 at 19-21, Pg. ID 478-480.)  Bond argues, however,

that she may nevertheless bring her Title VII claim against Aeotek because the

firm shares an "identity of interest" with Sodecia.  (*Id.*)  Bond says that "the

relationship between [Aerotek and Sodecia] was much more than [normally exists with] a typical staffing company," and therefore she did not have to name Aerotek in her EEOC charge.  (*Id.*)  Bond is incorrect.  The record conclusively establishes that Aerotek and Sodecia are not "virtual alter egos," do not share an "identity of interest," and are, instead, "two distinct entities with different business operations." *Knafel*, 899 F.2d at 1481.

Indeed, when the Court applies both tests for "identity of interest" that the Sixth Circuit outlined in *Romain*, Bond falls far short of identifying a question of material fact on this issue.  Bond fails the first test because she has presented no evidence that Aerotek had notice of or an "opportunity to participate in conciliation proceedings aimed at voluntary compliance…" *Romain*, 836 F.2d at 245. [3]

Bond likewise is unable to establish an "identity of interest" under *Romain*'s second (four-part) test.  Under the test's first component, the Court must determine if, "through reasonable effort," Bond would have been able to ascertain Aerotek's "role." *Id.*   And although Bond claims that it was not "unreasonable for [her] to

---

[3] Even if Aerotek had learned of the EEOC charge by, for example, having its employees appear as witnesses – and Bond has presented no evidence that it did – that still would not be enough to satisfy her burden:  "Mere notice of the EEOC investigation [] is insufficient to satisfy the test … An employee's attendance as a witness at a mediation proceeding for resolving Plaintiff's claims … is insufficient to create an identity of interest because [the unnamed party] was not provided an opportunity to conciliate with Plaintiff *on its own behalf*." *Weatherspoon v. North Oakland General Hospital*, 2006 WL 126615 at *3 (E.D. Mich. Jan. 17, 2006) (emphasis added).

24

believe she worked for Sodecia," it was in fact unreasonable for her not to believe she *also* worked for Aerotek.   Indeed, *as Bond has conceded, she knew that Aerotek was her employer.* (SOF at ¶¶6, 10.)   Her knowledge of Aerotek is unsurprising given that she contacted an Aerotek recruiter when she was seeking employment (SOF at ¶¶6-7), she completed Aerotek pre-employment paperwork that expressly stated that she would be employed by Aerotek (*id.* at ¶¶8-11), she kept in contact with her Aerotek recruiter Ryan Stamper while working at Sodecia (*id.* at ¶31-32), and, as her counsel acknowledged during oral argument, she received her paychecks from Aerotek.  Bond, therefore, knew of Aeotek's role and could have (and should have) named Aerotek in the Charge.

Bond also fails to show that Aerotek and Sodecia's interests are "so similar … [that] it would be unnecessary to include [Aerotek] in the EEOC proceedings," *Romain*, 836 F.2d at 245.  There simply is no evidence in the record linking the two companies beyond the limited Services Agreement.  Bond has presented no evidence that Aerotek and Sodecia are anything other than "separate institutions having separate interests.  [Thus, while] they have a contract with each other, [Sodecia's] interests are not so similar to [Aerotek's] that [Aerotek] would be adequately represented by [Sodecia] in an EEOC proceedings where [Bond] had potential claims against both [companies]." *Weatherspoon*, 2006 WL 126615 at *4 (granting motion to dismiss due to plaintiff's failure to name defendant in EEOC

25

charge).

Bond has also failed to present any evidence that Aeortek did not suffer prejudice – the test's third factor – when it was unable to participate in the EEOC proceedings and attempt to avoid the "expense and inconvenience of litigation." *Romain*, 836 F.2d at 245.

Finally, as to the test's fourth component, Aerotek never represented to Bond that its relationship with her was to be through Sodecia.   Instead, Aerotek made clear again and again that it employed Bond directly.  (*See, e.g.,* Aerotek Employment Documents at ECF #33-6, #33-7, and #33-8.)

The facts of this action resemble other cases in which courts have determined that staffing companies (like Aerotek) do not have an "identity of interest" with their clients (like Sodecia).  *See, e.g., Pesik v. Colorado State Univ.*, 2003 WL 716551 at *2-*3 (10th Cir. Mar. 3, 2003) (finding that staffing company and client "plainly … are not related in any way" and affirming dismissal of complaint for failure to name staffing company in EEOC charge); *Ganthier v. North Shore-Long island Jewish Health System*, 298 F.Supp.2d 342, 347 (same). The Court finds these authorities persuasive and follows them.   Because Bond failed to establish that Aerotek and Sodecia share an "identity of interest," her failure to name Aerotek in the Charge precludes her from asserting her Title VII claim against Aerotek.

> **3.  Aerotek is Entitled to Summary Judgment on Bond's Title VII and ELCRA Claims Because Aerotek Did Not Discriminate Against Her**

Bond's discovery responses are fatal to her discrimination claims against Aerotek.  When asked in interrogatories to "identify … each person at Sodecia and/or Aerotek who you believe discriminated against you and/or treated you differently on the basis of your race," Bond did not identity a single Aerotek employee who discriminated against her.  (Bond's Interrogatory Responses, ECF #33-12 at 4, Pg. ID 379.)  Since nobody at Aerotek discriminated against Bond, Aerotek cannot possibly be liable to Bond under Title VII or the ELCRA.[4]

Bond may be arguing that Aerotek is liable for Sodecia's alleged employment discrimination, but that claim, too, would fail as a matter of law.  As explained above, Bond had failed to present a *prima facie* case that Sodecia violated Title VII or the ELCRA, so any derivative claim against Aerotek based upon alleged discrimination by Sodecia must fail.  Moreover, as Aerotek correctly notes, Bond has failed to present any evidence that Aerotek had any control over Bond's working environment at Sodecia.  Bond counters that (1) Aerotek's handbook "encourages employees to bring questions or concerns [about their

---

[4] As noted above in Section (B)(3) above, Aerotek is entitled to summary judgment on Bond's Title VII claim because Bond did not name Aerotek in the Charge. Even if Bond had named Aerotek in the Charge, Aerotek would still be entitled to summary judgment because Bond has no evidence that Aerotek discriminated against her.

working conditions] to an Aerotek employee," and (2) "[t]he record is replete with [Bond] contacting Aerotek employee Ryan Stamper to try to resolve the various issues," (Bond's Br., ECF #36 at 26-27, Pg ID. 486), but these observations do not advance her discrimination claims against Aerotek. The record establishes that when Bond contacted Aerotek to raise issues with how Kalil or others at Sodecia treated her, Aerotek took action to address her concerns. For example, when Bond told Stamper about Kalil's "monkey" comment, "Aerotek [] notified Sodecia that [Bond] had raised a concern about the comment," and Sodecia subsequently "counseled" Kalil about his comments. (SOF at ¶¶32-33.) Far from discriminating against Bond, Aerotek tried to improve her working conditions at Sodecia and then tried to find her another position after she left Sodecia. (SOF at ¶63.) Bond simply has no basis to assert a discrimination claim against Aerotek.

The facts of this case closely parallel those in *Haddad v. Adeco, USA*, 2005 WL 3556060 (W.D. Mich. Dec. 29, 2005), in which the court dismissed a similar discrimination claim against a staffing agency. In *Haddad*, an employee brought a discrimination claim against both a temporary employment agency (Adeco) and the organization at which Adeco had placed her (the American Cancer Society (the "ACS")). After the ACS fired the employee, she filed suit. The court granted summary judgment against the employee. The court stressed that "[t]he record shows that Adeco never took adverse action against Plaintiff on any basis. While

Adeco did accept ACS's decisions about Plaintiff's terminated placement and the failure to promote her to a higher placement, Adeco had no choice in the matter because it was merely supplying workers to ACS and ACS controlled its own workplace." *Id.* at \*3, n.2.  The same analysis applies with equal force here. Sodecia, not Aerotek, controlled the relevant workplace (*see* SOF at ¶3, quoting the Services Agreement at § 2.2, Pg. ID 292), and Bond has presented no evidence to show otherwise.  Bond has failed to show that Aerotek or any of its employees took any adverse employment action against her, and her ELCRA claim against Aerotek therefore fails.

## **CONCLUSION**

For all of the reasons stated in this Opinion and Order, **IT IS HEREBY ORDERED** that Sodecia and Aerotek's motions for summary judgment (ECF #33 and #34) are **GRANTED**.

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated:  June 24, 2014

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on June 24, 2014, by electronic means and/or ordinary mail.

s/Holly A. Monda
Case Manager
(313) 234-5113

29